468 So.2d 1291 (1985)
MAYOR AND COUNCIL OF MORGAN CITY, et al
v.
ASCENSION PARISH POLICE JURY, et al.
No. CA 84 0185.
Court of Appeal of Louisiana, First Circuit.
April 16, 1985.
*1292 Doris Falkenheiner, Baton Rouge, for plaintiff-appellee, Mayor and Council of Morgan City, et al.
Jack Marioneaux, and Joseph W. Cole, Jr., Ventress, for defendant-appellant, Iberville Parish Police Jury.
Gordon R. Crawford, Asst. Dist. Atty., Gonzales, for defendant-appellant, Ascension Parish Police Jury & Assumption Parish Police Jury & The Lower Delta Soil & Water Cons. Dist.
William Stark, and Grady C. Weeks, Houma, for defendant-appellant, State of Louisiana, Department of Transportation Development, Office of Public Works.
Before COLE, CARTER and LANIER, JJ.
LANIER, Judge.
This is a suit to enjoin the construction of the Lake Verret Watershed Project (the project) brought by the City of Morgan City and St. Mary Parish against the Parishes of Iberville, Ascension and Assumption, the Lower Delta Soil and Water Conservation District and the State of Louisiana, Department of Transportation and Development, Office of Public Works. After a trial on the merits, the district court permanently enjoined construction on the project. This devolutive appeal followed.

FACTS
The pertinent facts are set forth in the district court judge's excellent reasons for judgment as follows:

RELEVANT GENERAL FACTS
The project encompasses approximately 248,000 acres of land in the parishes involved. Of this acreage 125,000 acres are classified as swamp or wetlands; 90,000 acres are deemed agricultural; the remainder, including forests, are categorized as miscellaneous. The area primarily benefitted is about 55,000 acres of farmland which will profit from improved drainage. Flood relief will accrue to the western urban area of the City of Donaldsonville, Ascension Parish. Approximately 9,000 acres of forest lands will be retained or managed as wildlife habitat. To reduce the effect of increased erosion resulting from conversion of some area from swamp to agricultural use, land treatment measures are called for to be undertaken by individual owners under supervision and guidance of local governmental agencies such as farm bureaus.
Improved drainage and accelerated run off of water will be accomplished by construction of approximately 168 miles of channel work with appurtenant measures, structures for water control and measures to minimize adverse effects on fish and wildlife. Minimal loss of wetlands (approximately 29 acres) will result from channel construction. Channel work will consist of clearing and removal of debris on 20 miles of existing channels, 6 miles of new construction *1293 and 142 miles of channel enlargement by excavation as distinguished from dredging. It is conceded the project will not cause additional waters to drain into Lakes Verret and Palourde. It is also shown that the natural flow of water in the project is from Iberville Parish on the north into Ascension Parish and thence into Assumption Parish through natural and other existing channels into Lake Verret and thence into Lake Palourde. Not all of the flow, however, goes through or into Lake Verret in Assumption Parish and thence into Lake Palourde in St. Mary Parish.
Lake Palourde, situated north of Morgan City, the largest municipality in St. Mary Parish, is the principal source of Morgan City's raw drinking water. The Atchafalaya River, which flows through Morgan City, is the secondary source of Morgan City's water supply.
Additionally, Lake Palourde is important as an outdoor recreational area providing fresh water fishing, bathing, water sports and related activities such as power boat racing for Morgan City and the surrounding area.

WATER QUALITY CERTIFICATION
The project was under consideration and discussion with state and federal agencies concerned for a number of years prior to October, 1978. Plaintiffs were vitally interested in the project from the standpoint of possible pollution of Lake Palourde as a source of water for Morgan City and also the preservation of aquatic life in the lake as well as the lake's continued use as a primary source of recreation. Included in the agencies concerned were the United States Corps of Engineers (Corps) whose approval was required for dredging permits under applicable Federal Laws. Permits were required pursuant to the Federal Clean Water Act (33 USC 1251(a) (the Act)), to insure and maintain the chemical, physical and biological integrity of the nation's waters. One such permit is a water quality certificate required by Section 401 of the Act as an indispensable prerequisite to other federally required permits. An additional permit to dispose of dredge materials into waters of the United States is required by Section 404 of the Act. See USC 33:1341 and 1344. It is conceded the Corps relies upon local or state water quality certifications as compliance with Section 401 of the Act.
From 1973 to 1980 Plaintiffs were represented by their then attorney, M. [Michael] Osborne. During this period and before issuance of the required water quality certificate by the [Louisiana Stream Control] Commission in October, 1978, at least three public meetings were held to air the project and give both proponents and opponents opportunity for input. From the inception, the City voiced serious concern regarding the possible pollution and increased silting effect on Lake Palourde resulting from dredging and introduction of additional chemicals from the increased agricultural area to be created above Lake Verret.
During most of the period preceding October, 1978, and when the water quality certificate was issued on October 13, 1979 [sic, 1978], Robert A. LaFleur was Executive Secretary of the Louisiana Stream Control Commission. It is not disputed that on numerous occasions Osborne requested that LaFleur advise him of the filing of an application for water quality certification by the proponents of the project because it was the intent of the officials of Morgan City to oppose the project. It is also not disputed that LaFleur advised Osborne that Osborne would be notified when the application was actually made.
The Commission's files contain a letter of October 12, 1978 making formal application for a water quality certificate. At that time the issuance of such certificates was under the jurisdiction of the Stream Control Commission pursuant to LSA-R.S. 56:1431-1446.4, which statute was subsequently repealed by Act 449 of 1979, LSA-R.S. 30:1091-1096, which created the Office of Environmental Affairs, Environmental Control Commission (Environmental Commission).
Briefly put, R.S. 56:1431-1464.4 created the Stream Control Commission (Commission) and gave it control of waste disposal, *1294 public or private by any person into any of the waters of the state, for prevention of pollution tending to destroy fish life or be injurious to public health, public welfare or of aquatic life or wild or domestic animals or fowls. The Commission was authorized to set pollution standards for waters of the state and regulate, restrain or control discharges of waste materials or polluting substances discharged or proposed to be discharged into any waters of the state. Section 1435 authorized the Commission to promulgate rules and conduct investigations necessary to carry out the purposes of the law. The Commission of Wildlife and Fisheries was designated the official to enforce and administer the statute. It is conceded that the Commissioner delegated to LaFleur the duty of issuing water quality certificates.
In essence, the Water Control Law (Act 449 of 1979) transferred all of the duties and powers of the Commission to the Environmental Commission. It also conferred on the Environmental Commission broader powers and duties than had been formerly vested in the Commission.
LaFleur testified that on receipt of the letter of application for water quality certification dated August [sic, October] 12, 1978 he issued the certificate the following day, August [sic, October] 13, 1978, without calling a hearing or notifying any representative of the City or any other plaintiff. He conceded that although mandated to do so, the Commission had never adopted or promulgated rules or regulations governing the issuance of water quality certificates. The procedure established was simply that when an application was made, his staff and interested agencies would make surveys and that a certificate would issue when he, as Executive Secretary of the Commission, had sufficient information to insure that no harmful pollution would result from the discharge or activity proposed. Due to his years of service with the Commission, LaFleur felt that he had ample knowledge concerning all waters of the state; that he applied this knowledge in all instances and that when necessary, he supplemented this knowledge by requiring an Environmental Impact Study (EIS) from an appropriate state agency such as the Agriculture Department or other concerned state or federal agency. He explained that the purpose of an EIS is to determine the effect of a proposed project or discharge upon the public waters from the standpoint of pollution of a source of drinking water or effect upon fish or wildlife.
Although he was aware of some opposition to the project and some reservations of members of his own staff concerning this particular permit, LaFleur stated he knew the matter had been under consideration for a number of years and that due to studies made the project had been revised on numerous occasions to satisfy the concerns and fears of various interested parties and agencies. LaFleur also noted that during his career thousands of such certificates had been issued without complaint or opposition. Upon receipt of the application, LaFleur issued the certificate the following day on the basis of his personal knowledge, the several meetings held, an EIS prepared by the U.S. Department of Agriculture under date of April, 1978 and his conviction the project would not violate anti-pollution laws then in force. He stated that in this instance, as in innumerable others, the final decision rested with him and he saw fit to grant the application.
On October 13, 1978, when the certificate was issued, promulgation of orders of the Commission was governed by LSA-R.S. 56:1435, which states:
`The commission may make and promulgate such rules and regulations and conduct such investigations as it deems necessary to carry out the provisions of this Part.
Rules, regulations, determinations, and orders of the commission shall be promulgated by publication in one issue of a newspaper designated as the official journal of the parishes affected and in one issue of the official journal of the state. In the discretion of the commission, any such promulgation by publication may be confined to publication in one issue of the official journal of the *1295 state and actual notice to parties affected, or, in cases where the rules, regulations, determinations and orders are applicable and of interest only to the parties affected, confined to such actual notice without publication.'
LaFleur's letter of October 13, 1978 to the Lake Verret Watershed Commission certified that the project would not violate water pollution regulations. It enclosed copy of a notice to be published one time by the Project's officers in the State Times, the official state journal published in Baton Rouge. The notice was so published on October 30, 1978. It recites that the Watershed Commission had applied to the Corps for a permit for the project in Iberville, Assumption and Ascension Parishes, including channel work, and that application was also made to the Stream Control Commission for water quality certification. The notice further stated that comments concerning the application could be filed with the Stream Control Commission within 10 days of publication. No notice was published in the official journal of either Iberville, Ascension or Assumption Parish. Neither was any notification sent to Plaintiffs.
LaFleur explained that the above method of handling publication had been utilized by the Commission since its inception. Once it was decided the application would not violate pollution laws, the custom was to issue the certification; notice would then be published one time in the official state journal. Comments or opposition was requested within 10 days of publication, the certification remaining dormant for that period. On expiration of the 10 day period if no comment or opposition was filed with the Commission, the certification ipso facto became viable and operable.
....
There is no question but that LaFleur and other Commission officers and agents were fully aware of Plaintiffs' intense desire for a hearing before the Commission prior to issuance of this particular certification. John Givens, LaFleur's assistant until LaFleur's retirement in September, 1979, testified that he, as well as LaFleur, knew of Plaintiffs' interest and desire for a public hearing. Givens added that before issuance he had reservations about the certification and made them known to LaFleur who assured him there would be no certification until all was in order. Givens added that when LaFleur left the Commission LaFleur told him the Project was on hold, although LaFleur had already signed the certificate.
The record establishes the following additional facts. By letter dated February 9, 1979, the appellees (through counsel) advised the Stream Control Commission (Commission), in pertinent part, as follows:
We represent the City of Morgan City and the St. Mary Parish Police Jury. They are concerned over the damage to water quality that will occur if the Soil Conservation Service, Lake Verrett Water Shed program is implemented. They are concerned about siltation, pesticides and chemical pollution of Lake Palourde, Lake Verrett and other downstream receiving waters.
We understand that the local sponsors, Lower Delta Soil and Water Conservation District and the Police Juries of Iberville, Assumption and Ascension Parishes will be applying to you for a Section 401 Water Quality Certification. Morgan City and St. Mary Parish would like to get notice when application is made so they may oppose this application and would like to become a `party,' (under LSA-RS 49:951(4)) to a hearing on the application so that they might submit the facts and views of the citizens of Morgan City and St. Mary Parish, concerning pollution and destruction of municipal water supplies, recreational areas and areas of fish and shell fish production.
The Commission, through J. Burton Angelle, its chairman, responded by letter dated February 19, 1979, in pertinent part, as follows:
Reference is made to your letter dated February 9, 1979, relative to your position on the Lake Verrett watershed.

*1296 This agency has not yet received a request for a Section 401 water quality certification on the aforementioned project.
Although no rules and/or regulations have been adopted relative to Section 401 certification, we have established, and followed, a procedure prescribed by law (LRS 56:1439.65). The procedure has been followed for a number of years. A copy of a form public notice is enclosed for your information.
This response was drafted for Mr. Angelle by Mr. Lafleur. Lafleur acknowledged in his testimony the facts recited in the letter were an error on his part.
On April 10, 1979, the Corps held a public hearing on the project in Donaldsonville, Louisiana. The appellees were represented at this hearing. After the hearing, the Corps received additional water quality data and issued a 404 certificate for dredging in June of 1980.
On April 24, 1979, counsel for the appellees (J. Arthur Smith, III) appeared before the Commission and requested that it promulgate rules for adjudicatory hearings as required by the Louisiana Administrative Procedure Act (LAPA), La.R.S. 49:950 et seq. Counsel told the Commission appellees seriously protested the project, intended to participate in any hearing on the project and would present evidence which demonstrated the project would be violative of Louisiana's water quality criteria. Mr. Lafleur advised counsel for the appellees that no request for water quality certification had been made for the project.
In September of 1979, Mr. Lafleur retired and was succeeded by Mr. John Dale Givens. Mr. Givens testified that before Mr. Lafleur left office, he (Lafleur) advised him that he (Lafleur) anticipated a request for certification of the project, the certification should not be issued until more information was received and to make sure all information was received before action was taken. The Commission had a file on the project, but a copy of the October 1978 letter of certification was not contained therein. Mr. Givens learned Mr. Lafleur had issued the letter of certification from counsel for the appellees.
Counsel for the appellees did not discover the certification had been issued until late 1980 or early 1981. This information was brought to Mr. Givens' attention. By letter dated May 11, 1981, Mr. Givens, on behalf of the Department of Natural Resources, Office of Environmental Affairs, Water Pollution Control Division, wrote to the Lake Verret Watershed Committee and advised as follows:
At the request of concerned citizens I have reviewed the events that led up to a letter being written by Mr. Robert A. Lafleur on October 13, 1978, who was at that time the Executive Secretary of the Louisiana Stream Control Commission, that provided you with a public notice concerning the Lake Verret Watershed Project and a tentative determination with respect to water quality certification as provided for by Section 401 of the Federal Clean Water Act. The circumstances surrounding the above mentioned letter of certification clearly indicate that the provisions of L.R.S. 56:1439(5), which governed the issuance of such certifications were not followed. Therefore, water quality certification as required by Section 401 of the Clean Water Act has not been issued and any such certification purported to be a part of the October 13, 1978, letter is hereby declared null and void. Since no water quality certification exists for your project I suggest that you give serious consideration to delaying any further implementation or construction until such certification can be issued.
Your original application provided only scanty information regarding the proposed project and did not contain any information concerning the existing water quality in the area of the proposed work nor any information with respect to anticipated effects your project would have on Lake Verret and its ancillary water bodies. Furthermore, the Louisiana Stream Control Commission, on April 24, 1979, made a commitment to opponents of your project in that they were *1297 told that they would be given the opportunity to be heard concerning their allegations and concerns on the water quality impacts of your proposed project.
By letter dated June 4, 1981, counsel for the appellees advised the Office of Environmental Affairs (Environmental Control Commission) of the following:
By letter dated May 11, 1981, Mr. J. Dale Givens, Administrator, Water Pollution Control Division, advised the chairman of the Lake Verret Watershed Committee, and others, that no water quality certification exists for the project. Attached is a copy of Mr. Givens' letter. Mr. Givens suggested to the chairman that the Watershed Committee `give serious consideration to delaying any further implementation or construction until such certification can be issued.
I have been informed that construction in Iberville and/or Ascension Parishes is being conducted despite the lack of a valid water quality certification. This is an apparent violation of the Louisiana Water Control Law, R.S. 30:1091 et seq., and I am bringing it to your attention.
This suit was filed on June 22, 1981. On August 24, 1981, the Office of Environmental Affairs (OEA) held a nonadjudicative fact finding hearing on the water quality certification of the project. The OEA voted not to take action because the matter was in court.

NOTICE AND DUE PROCESS

(Assignments of Error 1, 2 and 3)
The district court judge granted the permanent injunction for the following reasons:
Under the circumstances, the Court finds the decisive issue in this instance is not whether the Commission acted arbitrarily, capriciously or without good cause but the transcending question of alleged lack of due process for failure to give Plaintiffs proper notice before the certification issued.
....
Clearly, the Commission did not comply with the statutory mandate regarding publication of its orders in this instance. No publication was made in either of the three parishes affected. Neither was actual notice given Plaintiffs who were known by the Commission and its officers to possess a vital interest in the project.
It follows that the action of the Commission was in violation of express statutory provisions governing promulgation of the Commission's orders.
Our jurisprudence permits enjoining of illegal or ultra vires actions of administrative boards and officers and/or governmental subdivisions without a showing of irreparable injury. Lindsey v. Holland, 95 So.2d 74, [754] La.App. 1st Cir. (1957); Budd Construction Co., Inc. v. City of Alexandria, 401 So.2d 1070, La.App.3d Cir. (1981); Connell v. Commission Council of City of Baton Rouge, 153 La. 788, 96 So. 657 (1923).
In view of the foregoing, the Court concludes that the certification in question is null, void and of no effect for lack of due process, namely, failure to publish the Commission's order as required by law.
Since it is conceded the validity of the Federal 404 order is dependent for its viability upon the validity of the Commission's certification, Plaintiffs are entitled to the injunctive relief requested.
Appellants contend the district court erred by finding a failure to comply with the notice provisions of La.R.S. 56:1435 was a denial of due process and, in any event, legal advertisement in the affected parishes of Iberville, Ascension and Assumption would not have provided actual notice to Morgan City and St. Mary Parish. Appellants further contend that a minor technical defect, such as not publishing the notice in the affected parishes, should not be the basis to enjoin the project.
This argument assumes that because the project work was to be performed in Iberville, Ascension and Assumption Parishes, they are the only affected parishes. The appellees contended (and were prepared to present evidence to prove) the project will violate Louisiana's *1298 water quality criteria in Lake Palourde, the principal source of raw drinking water for Morgan City. Lake Palourde and Morgan City are in St. Mary Parish. Although the project work was not to be performed in that Parish, the project certainly would affect St. Mary Parish according to the appellees' allegations. Notice of the issuance of the water quality certification for the project should have been published in all four parishes to comply with La.R.S. 56:1435. Had that been done, St. Mary Parish and Morgan City would have received legal notice.
The importance of notice in administrative proceedings is set forth in Tafaro's Investment Co. v. Division of Housing Improvement, 261 La. 183, 259 So.2d 57, 60-61 (1972), as follows:
The giving of notice of a hearing by administrative agencies need only be reasonable and need not meet the exacting requirements for notice in judicial proceedings. The type of notice and the method of notice vary with the quality of the proceeding and the results which can obtain after hearing. Notice must serve the purpose of informing the parties of the nature and time of the proceedings, the purpose of the hearingi.e., the possible consequences or the manner in which interests may be affected, and the method of presenting objections to the administrative action. The United States Supreme Court put it in these terms: "`An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. * * *'" Schroeder v. New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962).
See also Force and Griffith, The Louisiana Administrative Procedure Act, 42 La.L. Rev. 1227, 1259-1261 (1982). In addition to La.R.S. 56:1435, the Commission was also subject to the Louisiana Administrative Procedure Act (LAPA), La.R.S. 49:950 et seq., La.R.S. 49:951(2) and 955(B).
The importance of notice in the certification procedure utilized by the Commission is self-evident. When an application for certification was presented, the Commission's staff would review the application. If the Commission's Executive Secretary determined the project did not violate water pollution regulations, he would issue a provisional certificate. The notice required by La.R.S. 56:1435 was then published advising that opposition to the project was requested within ten days of publication. The certification remained dormant during this ten day period. If an opposition were filed in this ten day period, the following pertinent provisions of La.R.S. 56:1442, then in effect, would be triggered:
Any person who feels himself aggrieved by ... any other order of the commission, may file a sworn petition with the commission, setting forth the grounds and reasons for his complaint and asking for a hearing of the matter involved. The commission shall thereupon fix the time and place for the hearing and shall notify the petitioner thereof. At the hearing the petitioners and any other interested parties may appear, present witnesses, and submit evidence. Following the hearing, the final order of determination of the commission upon such matter is conclusive.[1]
If no opposition were filed, the certification would become viable and operable. Thus, to publically and formally oppose a project before the Commission, it was essential for the opponent to receive notice of the granting of the provisional certificate and the commencement of the ten day period for filing an opposition.
Prior to the issuance of the provisional certificate, the Commission was aware of Morgan City's objections to the project and its intent to formally contest the certification. Despite this knowledge, the provisional certificate was issued one day after the application for it was filed, the notice *1299 required by La.R.S. 56:1435 in the four affected parishes was not published and no actual notice was given to Morgan City, St. Mary Parish or their counsel. Further, although the certification for the project had issued, when the appellees subsequently wrote to the Commission and appeared before it, they were advised by the Commission no request for certification had been filed. The appellees did not get actual notice of the certification until after the project was under construction. The failure of the Commission to give the appellees notice as required by law and the misleading factual information given to the appellees on behalf of the Commission deprived them of their right given by law to have an administrative hearing to present their opposition. The district court correctly ruled this was a due process violation.
Appellants contend, even if there is a due process violation, the appellees must also show the failure to advertise was arbitrary, capricious or an abuse of discretion to prevail. Appellants contend the district court committed error by granting relief only on a showing of a due process violation because in Louisiana Power and Light Company v. Louisiana Public Service Commission, 369 So.2d 1054, 1062 (La.1979), appears the following:
Our review is limited to determining whether such bodies have acted in an arbitrary and capricious manner such that their action violates the rights of due process of those who are affected by their decisions.
As previously indicated, the LAPA was applicable to the Commission. La.R.S. 49:964(G) provides as follows for a district court review of an administrative adjudication:
The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. In the application of the rule, where the agency has the opportunity to judge of the credibility of witnesses by firsthand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
The six grounds for reversal or modification of an administrative action are separated in the statute by the disjunctive conjunction "or". La.R.S. 1:9; Cf. La.C.C.P. art. 5056; La.C.Cr.P. art. 6; La.C.J.P. art. 5. Thus, any one of these grounds is a sufficient basis for such judicial action. In Force and Griffith, supra, at 1283 and 1285-1286, appears the following:
The first four grounds which justify judicial reversal or modification of an agency's decision involve evaluations of agency actions in light of established legal standardse.g., does the agency action violate the constitution; does the agency action violate a statute; has the agency gone beyond the authority delegated to it by statute; was the agency action based upon some error of law? These grounds raise traditional legal issues.
....
Subsections 964G(5) and (6), while they appear to be similar, are not intended to be applied to the same considerations. Sometimes courts confuse the two standards, such as when one court said that whether the agency committed `manifest error' depends on whether the agency acted `arbitrarily' or `capriciously.' The manifest error test is used in reviewing the facts as found by the agency. The arbitrariness test is used in reviewing conclusions and exercises of agency discretion. *1300 Where there are no factual issues the manifest error test is not used.
[Footnotes omitted].
In the instant case, the actions and omissions of the Commission constituted violations of the appellees' constitutional due process rights and their statutory rights to notice and an administrative hearing, La. R.S. 49:964(G)(1), and the water quality certificate was issued by following an unlawful procedure, La.R.S. 49:964(G)(3). Each of these grounds was a valid basis for the district court ruling.
The quote from Louisiana Power and Light Company v. Louisiana Public Service Commission (LP&L v. LPSC) relied on by appellants is not applicable to the instant case. The sole issue in that case concerned an order by the district court for LP&L to make an accounting to determine the amount of refund or credit due to industrial customers for amounts paid while a LPSC order was in effect. LP&L v. LPSC, 369 So.2d at 1057. The district court had found the decision of the LPSC was arbitrary, and no party challenged that ruling on appeal to the Louisiana Supreme Court. Thus, the referenced quote is dictum. Further, the arbitrariness test is applicable to conclusions and exercises of discretion of an administrative agency, such as the decision to grant the certification in the instant case. It is not applicable to errors of law, such as those upon which the district court decision herein is based. Finally, it is questionable whether the LAPA is applicable to the LPSC. Louisiana Consumers' League, Inc. v. Louisiana Public Service Commission, 351 So.2d 128 (La. 1977); Force and Griffith, supra, at 1231-1233.
Appellants contend any error in notification was cured by actual notice to the appellees, citing Brown v. Sutton, 356 So.2d 965 (La.1978). The district court found as fact "[n]either was actual notice given Plaintiffs who were known by the Commission and its officers to possess a vital interest in the project." This factual ruling is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The record reflects appellees did not receive actual notice of the certification until late 1980 or early 1981.
Appellants contend appellees were afforded sufficient due process protection because they could have presented information to the Commission at anytime; and the appellees suffered no injury by the lack of notice because even if notice had been given the result would have been the same. These contentions are without merit. Appellants also contend appellees could have presented their evidence at the Corps hearing but did not. Because the Louisiana water quality certification was an indispensable prerequisite to the Corps § 404 dredging permit, the proper place to contest water quality was before the Commission.
These assignments of error are without merit.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

(Assignment of Error 4)
Appellants contend appellees are not entitled to judicial relief because they have failed to exhaust available administrative remedies, citing Steeg v. Lawyers Title Insurance Corporation, 329 So.2d 719 (La. 1976) and Taylor v. South Central Bell, 422 So.2d 528 (La.App. 5th Cir.1982). Appellants assert there are two exceptions to this rule: (1) where the parties are threatened with irreparable injury; and (2) where administrative remedies are proven useless. Waggoner v. American Bank and Trust Company, 423 So.2d 794 (La.App. 4th Cir. 1982); State Board of Education v. Anthony, 289 So.2d 279 (La.App. 1st Cir.1973), writs denied, 292 So.2d 246 (La.1974).
When the plaintiff in an injunction proceeding alleges the defendant is acting in violation of the law, there is no need to prove irreparable harm. McElveen v. Calcasieu Parish Police Jury, 443 So.2d 666 (La.App. 3rd Cir.1983), writ denied, 444 So.2d 1222 (La.1984); Hays v. City of Baton Rouge, 421 So.2d 347 (La.App. 1st Cir.1982), writ denied, 423 So.2d 1166 (La. 1982). Appellees have alleged and proven *1301 the water quality certification for the project was issued in violation of the notice provisions of La.R.S. 56:1435, and this deprived appellees of their right to a hearing as provided by La.R.S. 56:1442, all of which is in violation of their constitutional rights to due process. When these facts were brought to the attention of the Water Pollution Control Division of the Office of Environmental Affairs of the Department of Natural Resources of the State of Louisiana, the project's water quality certification was declared null and void. Apparently, construction on the project continued without the requisite certification. Because appellees are contending a violation of La.R.S. 56:1435 resulted in a deprivation of La.R.S. 56:1442 rights and a due process violation, they are entitled to bring this action. Cf. McCastle v. Rollins Environmental Services of Louisiana, Inc., 415 So.2d 515 (La.App. 1st Cir.1982), writ denied, 420 So.2d 449 (La.1982).
Even though appellees filed this suit, they still brought this matter to the attention of the OEA. The OEA conducted a hearing but declined to take action because this dispute was in litigation. This sufficiently demonstrates the administrative remedy was useless and had been exhausted.
This assignment of error is without merit.

DECREE
For the foregoing reasons, the judgment of the district court is correct and is affirmed. The appellants are cast for all costs of $3,188.37. La.R.S. 13:5112.
AFFIRMED.
NOTES
[1] A "person" for purposes of La.R.S. 56:1442 is defined in La.R.S. 56:1433(1) as "any municipality, industry, public or private corporation, or co-partnership, firm, or any other entity".