SHORTESS, Judge,
dissenting.
The result that the majority reaches in this case by implication would overrule bedrock constitutional principles as embodied in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803) and U.S. v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) at the United States Supreme Court level and State ex rel Kuklman v. Rost, 47 La.Ann. 53, 16 So. 776 (1895), State v. Broom, 439 So.2d 357 (La.1983) and Henry v. Edwards, 346 So.2d 153 (La.1977) at the Louisiana Supreme Court level.
The facts are not in dispute since the trial court dismissed appellants’ suit on an exception of no right/cause of action. When dealing with these exceptions the reviewing court is bound by the rule of law restated by the Supreme Court in Sanborn v. Oceanic Contractors, Inc., 448 So.2d 91, 92 (La.1984):
It is well settled that the exception of no cause of action must be decided upon the face of plaintiff’s petition alone, and that all well-pleaded allegations of fact are to be considered as true. The reviewing court must determine whether the law affords a remedy under the circumstances alleged, under any theory of the case. (Emphasis mine.)
The actions alleged to have been taken by the Governor cannot be subject to any *721 misunderstanding insofar as this appeal is concerned because attached to appellants’ pleadings are letters dated July 30, 1984, signed by the Governor. Therein he (1) established the moratorium effective August 1, 1984; superceded the State Health Plan by ordering the DPA to revise, override its findings and approve eight nursing home proposals prior to the effective date of the moratorium (See Appendix A) and (2) discussed his authority under federal law and regulations and directed DNNR to follow specified guidelines in setting up a revised State Health Plan (See Appendix B). '
In my opinion appellants have alleged ultra vires acts and have a right/cause of action.
STATE LAWS AND REGULATIONS
The contract between the State and national government clearly describes the functions which the DPA is to perform. It incorporates the rules promulgated in Vol. 9, No. 11, of the November 20, 1983, Louisiana Register, including required minimal guidelines such as open hearings and appeals with public notice, with “the same amount of time will be allowed to those in favor and those opposed to the applications.”
The DPA is required to consider whether proposals conform with the State Plan, population needs, and availability of alternative, less costly, or more effective methods of providing services, with no bed needs computations allowed to exceed State Health Plan projections in effect at the time of review. The DPA is required to comply with the Secretary’s rules and any modification of the agreement may be done by mutual written consent of the State and the Secretary.
Appellants alleged they were informed by the DPA in April, 1984, that their expenditures did not conform to the DPA’s criteria, standards and plans; that they appeared in opposition to competing proposals in June, 1984; and that they learned, before the DPA made its independent determination, the Governor intervened on July 30, 1984, superceded the State plan, ordered the DPA to override its earlier findings and approve competitors’ applications (simultaneously he ordered the State plan changed to conform with these applications). Thus, legally and factually, this case is inapposite to Lifemark and PIA.
Appellants have alleged that the Governor took this action, even though he admitted that Fitzgerald had told him that the plan showed no need for these facilities; that elected officials and “citizens” felt a need greater than the plan allowed; that the plan needed to be changed to reflect their need; that he found existing needs for beds unmet contrary to the State Health Plan; that he was aware that these applications had some deficiencies based upon present program applications related to bed need in those localities; that he felt “pressures and entreaties from local officials and others” more important than present 1122 rules, regulations and criteria; that he directed DHHR to determine the need for acute care general hospital Medical/Surgical beds separately, excluding other specialties, and to determine the need for all specialties separately despite the fact that the plan required grouping them together. See Appendix A.
Appellants alleged that when they attempted to protest these events and appeal their own proposals, they were met with the moratorium. Earlier, appellants had been able to oppose their competitors’ plans at the DPA hearings. Under our holding in PIA, they may not have had any further administrative or judicial review. But the DPA did not grant the applications. The Governor superceded DPA with the moratorium and approved the competitors in question here and six others. Accordingly, questions have been raised about the due process issue of fundamental fairness of judging competing proposals on totally different standards, criteria and plans, while rejecting one as nonconforming to the plan but rejecting the entire plan as non-conforming to the hospital’s need for the other. This case, unlike Lifemark or PIA, raises far more fundamental separation of powers questions about the Governor’s use *722 of executive authority to supercede the whole legal regulatory scheme duly enacted by the Legislature.
The contract between Louisiana and the Secretary of DHHS also made the Division of Policy, Planning and Evaluation in the Office of Management and Finance of DHHR the sole designated agency “for the purposes of carrying out the Section 1122 reviews.” The agreement clearly describes the functions which DPA is to perform and mandates guidelines for use in finding expenditure proposals in conformity. The Act creating DHHR sets out the same lines for delegation of power.
JUDICIAL REVIEW OF EXECUTIVE ACTION
The Louisiana Supreme Court, in the landmark case of State ex rel. Kuhlman v. Rost, applied the judicial review concepts in Marbury v. Madison to acts of the legislative and executive branches. The courts have no authority to review the wisdom of the governor’s actions, but issues relating to its legality or validity and his authority to grant it are legitimate subjects of judicial review. State ex rel. Summit Fidelity and Surety Company v. Police Jury of Rapides Parish, 131 So.2d 623, 627-8 (La. App. 3rd Cir.1961); affirmed, 244 La. 713, 154 So.2d 373 (1963); and State v. United Bonding Insurance Company of Indianapolis, Indiana, 244 La. 716, 154 So.2d 374 (1963).[1]
One of the closest analogies to this case involved the item veto. The Supreme Court ruled that “the Governor may not use his item-veto power to usurp constitutional powers conferred on the Legislature.” The Court used the appropriateness test to prevent the Governor from vetoing limiting conditions without also limiting the item of expenditure which it modified to avoid gubernatorial usurpation of legislative powers by, in effect, creating “new” appropriation items wholly different in nature and purpose from that intended by the Legislature. Henry v. Edwards, 346 So.2d at 157-158.
In State v. Broom, 439 So.2d at 360-362, the Supreme Court held that lawmaking is a legislative function that is nondelegable to the executive branch without the dual protections of legislatively defined standards and safeguards, plus close monitoring, to insure protection from arbitrary and unreasonable agency decision-making. On rehearing, the Court emphasized that the Louisiana Constitution specifically confined each branch’s powers in contrast to the United States Constitution. “So long as the regulation or action of the official or board authorized by state law does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature_” 439 So.2d at 367; State v. Rodriguez, 379 So.2d 1084 (La.1980); and Schwegmann Brothers Giant Supermarkets v. McCrory, Commissioner of Agriculture, 237 La. 768, 112 So.2d 606 (1959), appeal dismissed, 361 U.S. 114, 80 S.Ct. 207, 4 L.Ed.2d 154 (1959). *723 The Governor has suspension and veto power, along with his affirmative authority, in the APA, LSA-R.S. 49:968, 970, while the Legislature may use its oversight functions and concurrent resolutions to nullify or suspend any administrative rule or regulation, also in the APA. LSA-R.S. 49:968-969. State v. Broom, 439 So.2d at 368, on rehearing.
The Louisiana Supreme Court found the weight of opinion to be that administrative agencies are bound by their own rules, with the best single authority for this principle, United States v. Nixon. Central Louisiana Electric Company, Inc. v. Louisiana Public Service Commission, 377 So.2d 1188, 1194-95 (La.1979).
[SJo long as the Attorney General’s regulations remained operative, he denied himself the authority to exercise the discretion delegated to the Board even though the original authority was his and he could reassert it by amending the regulations.... [I]t is theoretically possible for the Attorney General to amend or revoke the regulation defining the Special Prosecutor’s authority. But he has not done so. So long as this regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it. (Emphasis mine.) (Citations omitted.)
U.S. v. Nixon, 94 S.Ct. at 3100-02.
U.S. Supreme Court cases have consistently held that all presidential executive orders must find support in the Constitution either in a clause directly granting presidential power or directly through permissible congressional delegation of legislative powers. “It is clear that if the President had authority to issue the order he did, it must be found in some provision of the Constitution.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Where an executive order is issued pursuant to delegation of legislative power:
due process of law requires that it shall appear that the order is within the authority of the Executive, and if that authority depends on determinations of fact, those determinations must be shown. Again, when congressional legislation is the authority for an Executive Order, congressional statutes will take precedence over the Executive Order when they clash. A federal court states: “It is elementary law that executive regulations promulgated for the purpose of carrying a statute into effect must be within the framework of the Act and may not be inconsistent with the statute.”
Warner Const. Co. v. Krug, 80 F.Supp. 81, 84 (D.C.Dist.Col.1948); Panama Refining Co. v. Ryan, [293 U.S. 388] 55 S.Ct. 241 [79 L.Ed. 446] (1935); and McGann Mfg. Co. v. United States, 98 F.Supp. 225 (M.D.Pa. 1951), cited in Chester J. Antieau, Modern Constitutional Law: The States and the Federal Government,- § 13:25 (1969).
When I examine the Constitution and judicial interpretations thereof, I find that the Governor may have the power under the Constitution, laws and rules to change the rules and procedures to reassert the exercise of discretion he and the Legislature had delegated to the DPA. But as long as said rules remained in place,[2] he and the executive branch were bound by them. The Governor possesses no executive authority beyond that given by the Louisiana Constitution and/or statutes. To supercede them in the way he allegedly did here is investing in the executive uncontrolled legislative powers and presents a classic collision of constitutional powers.
DUE PROCESS STANDARDS
The key to due process is that a fair procedure is used, that it follow regulatory guidelines, either utilizing the APA in fact or by analogy and that it be flexible and *724 adequate under the circumstances. In the Matter of Rollins Environmental Services, Inc., 481 So.2d 118 (La.1985); Wilson v. City of New Orleans, 479 So.2d 891 (La. 1985); Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984); Cameron Telephone Company v. Louisiana Public Service Commission, 440 So.2d 694 (La.1988) cert. denied, 466 U.S. 959, 104 S.Ct. 2171, 80 L.Ed.2d 554 (1984); and Mayor and Council of Morgan City v. Ascension Parish Police Jury, 468 So.2d 1291 (La.App. 1st Cir.1985).
What it all boils down to is that Section 1122 reviews are predicated on need. If an application in one area is accepted, it is very likely that others in that same area will be rejected, for the original need will have been met. Fundamental fairness dictates and requires that expenditure proposals be judged on the basis of the same standards, criteria or State Health Plans. Appellants have alleged it was not done in this case. I would give them standing so they can attempt to prove what they have alleged.
I respectfully dissent.
“APPENDIX A”
July 30, 1984
Mr. Harvey J. Fitzgerald, Undersecretary
Department of Health & Human Resources Post Office Box 3776
Baton Rouge, Louisiana 70821
Dear Harvey:
Effective August 1,1984, and for an indefinite period of time, I am ordering the implementation of a moratorium on the 1122 Program. After 90 days, I will review with you the need for the continuance of this moratorium. During this time, the Health Planning Bureau shall devote itself to rewriting the State Health Plan and its Rules and Regulations. This should be done in conjunction with the Statewide Health Coordination Council. Seek comments and suggestions from health care providers and other interested and affected groups. The final document shall be a product developed in accordance with the Federal Law governing the 1122 Program, and shall be submitted to me for final review and changes prior to adoption and publication. Beginning on August 1,1984, and until this moratorium is lifted, the state shall not approve any applications for any type of health care facility or service. The only exceptions allowed will be group homes for the mentally retarded, and in cases that are necessary to keep existing health care facilities and services in compliance with State and Federal Laws or in cases not requiring additional beds, services and/or additional capital expenditures.
The new State Health Plan should be clear, concise and easily readable and understandable to the average citizen.
Another issue of extreme concern to me that must be addressed, and is considered a problem, relates to the need of additional nursing home beds. Elected officials and citizens throughout the state have written to me and personally confronted me with-various problems concerning the availability of nursing home beds, high occupancy, waiting lists, long distances to travel to existing nursing homes and various other problems. You and I have discussed these problems on several occasions. In many cases, you informed me that the plan did not show a need. However, these people are frustrated, as their need is apparently greater than the plan allows. If the problems lie within the plan, and I suspect that they do, correct it.
Where changes are required in the State Health Plan, assess the impact on state needs and the fiscal impact on the state budget. Contrary to the bed need as determined by the State Health Plan, I find existing needs that are unmet throughout the state, high occupancy rates in existing facilities and hardships that are caused by this.
As Governor, I am using Executive Authority to supersede the State Health Plan and to order you to approve the nursing home applications listed below that are to be located throughout the state. You are to *725 override the findings of the State Health Plan in the review of the following applications and to approve the facilities for reimbursement under the 1122 Program and the Social Security Act. These approvals are to be effective prior to the moratorium scheduled for August 1, 1984.
1. Caddo Nursing Home, Inc., Shreveport, La. # 5064
2. Bossier Nursing Home, Inc., Bossier City, La. # 5066
3. Ouachita Nursing Home, Inc., Monroe, La. # 5067
4. Logansport Nursing Home, Logans-port, La. # 5075
5. Pineville Nursing Home, Pineville, La. # 5013
6. Southfield Care Center, Inc., Le-eompte, La. # 5056
7. Baton Rouge Total Care Center, Inc., Baton Rouge, La. # 6009
8. Lafayette Nursing Home, Lafayette, La. # 5011
I am aware that these applications may have some deficiencies, based upon present program applications, especially when related to bed need in these particular localities. It is that very problem which points to the need for a review of the entire 1122 Program, since I have information from legislators and other local officials that there is specific need for these facilities in the eight designated areas, notwithstanding that data of a general area may indicate otherwise. Pressures and entreaties from local officials and others in these specific areas weigh heavily in support of approving those facilities, notwithstanding that data for the area in general may indicate otherwise under present 1122 Rules and Regulations and criteria emanating therefrom.
You are therefore directed on my behalf to recommend to the Secretary of DHHS that reimbursement for these facilities be included under the Social Security Act.
The foregoing is in conformity with and relates to our in-depth conference regarding overall health care facilities development matters which was held at the Mansion on July 23, 1984. As I understand, these actions are consistent with my authority under the law, and that the respite that this action provides will allow you and staff the opportunity to provide the state with a plan that more realistically addresses the current needs and goals for the future. Furthermore, it is my understanding that this action will not put any health service programs or funding in jeopardy. Unless you provide representations to me contrary to the above, then proceed as outlined.
Sincerely,
/s/Edwin W. Edwards EDWIN W. EDWARDS
“APPENDIX B”
July 30, 1984
Mr. Harvey J. Fitzgerald, Undersecretary
Department of Health & Human Resources
Post Office Box 3776
Baton Rouge, Louisiana 70821
Dear Harvey:
This follows our conversation of July 23, 1984, regarding certain aspects of the State Health Plan and the Division of Policy Planning and Evaluation. This also refers to a letter of July 16,1984, addressed to me by Mr. James J. Wyllie, Jr., a copy of which you have.
It is my understanding that the State Health Plan allows one standard to be applied to one group of specialty beds and another more restrictive standard is applied to another group of specialty beds, thus restricting the number of acute care general hospital Medical/Surgical beds allowed under the State Health Plan. I further understand that all hospital beds belong to some specialty group and one specialty does not necessarily relate to the services of another specialty: however, they may be grouped together in order to determine the need of one segment of that specialty group.
42 U.S.C. § 1320A-l(b) authorizes the Secretary of DHHS to establish a contract with the Governor relative to Section 1122. *726 42 CPR § 100.104 dictates that the Secretary of DHHS will contract with a state only after consultation with the Governor. The contract is then established between the Governor and the Secretary of DHHS.
The State Health Plan is established through statutory authority, and Public Law 96-79 gives the Governor final authority over the State Health Plan. Therefore, in questions concerning the State Health Plan, it is the Governor’s responsibility to interpret the meaning and direction of the State Health Plan. The Division of Policy Planning and Evaluation through the Department of Health and Human Resources is charged with the administration of the 1122 Program and has no jurisdiction over the State Health Plan.
I hereby direct DHHR to determine the need for acute care general hospital Medical/Surgical beds separately, excluding other specialties in order to determine acute care general hospital Medical/Surgical bed need, and to determine the need for all specialties separately and independently from the needs of other specialties. This interpretation applies to all applications currently under review and to all future applications.
The foregoing is in accordance with my understanding of the Health Planning Law, its Rules and Regulations as you have indicated to me in our recent conference. Furthermore, conflicting direction provided in the current State Health Plan along with inconsistent 1122 decisions made during the previous Administration is the catalyst that has raised the need for clarity, direction and interpretation along with Mr. Wyllie’s letter requesting some. It is my understanding and intent that the use of my authority in providing clear and definitive direction will not jeopardize the State’s participation in Federal Programs relating to health care services and that this will establish one consistent application of the plan.
Sincerely,
/s/ Edwin W. Edwards EDWIN W. EDWARDS
EWE:skm

. Other Governor's executive orders or actions reviewed by the Supreme Court include: Woodard v. Reify, 244 La. 337, 152 So.2d 41 (1963); Albritton v. Grace, 233 La. 273, 96 So.2d 565 (1957); and Chappuis v. Reggie, 222 La. 35, 62 So.2d 92 (1952). Other executive actions reviewed by the First Circuit include: Johnson v. Odom, 470 So.2d 988 (La.App. 1st Cir.1985), writ denied, 476 So.2d 355 (La.1985); Thoreson v. State Department of Civil Service, 433 So.2d 184 (La.App. 1st Cir. 1983), writs denied, 440 So.2d 726, 727 (La.1983); Tanner v. City of Baton Rouge, 422 So.2d 1263 (La.App. 1st Cir. 1982), writ denied, 429 So.2d 128 (La.1983), citing with approval Messina v. Rapides Parish Police Jury, 373 So.2d 745 (La.App. 3rd Cir. 1979), writ denied, 376 So.2d 1268 (La.1979); McCastle v. Rollins Environmental Services of Louisiana, Inc., 415 So.2d 515 (La.App. 1st Cir. 1982), writ denied, 420 So.2d 449 (La.1982); Harris v. Trustees of Louisiana Public Facilities Authority, Public Facilities Corporation, 356 So.2d 1039 (La.App. 1st Cir.1977), writ denied, 357 So.2d 558 (La. 1978); Roussel v. Noe, 274 So.2d 205 (La.App. 1st Cir.1973), writ denied, 281 So.2d 743 (La. 1973); Bussie v. McKeithen, 259 So.2d 345 (La.App. 1st Cir.1971), writ refused, 261 La. 451, 259 So.2d 910 (1972) (taxpayer standing); and Faciane v. Bosco, 236 So.2d 601 (La.App. 1st Cir.1970), writ denied, 256 La. 757, 238 So.2d 357 (1970).

. Any changes had to be made according to law and, in particular, 42 U.S.C. § 1320a-l et seq., 42 C.F.R., Part 100, the Agreement Between the Secretary of Department of Health and Human Resources, and the State of Louisiana to carry out the provisions of Section 1122 of the Social Security Act, and Rules in Vol. 9, No. 11, November 20, 1983, Louisiana Register.