356 So.2d 965 (1978)
Maurice L. BROWN
v.
R. T. SUTTON, Commissioner of Conservation, etc.
No. 60648.
Supreme Court of Louisiana.
March 6, 1978.
*966 Veil David DeVillier, Eunice, for defendant-applicant, R. T. Sutton, etc.
Ray A. Barlow, Joseph L. Hargrove, Jr., David L. Smelley, Hargrove, Guyton, Ramey & Barlow, Shreveport, for intervenor-applicant, Franks Petroleum, Inc.
J. Clayton Johnson, Taylor, Porter, Brooks & Phillips, Baton Rouge, Samuel W. Caverlee, Wilkinson, Carmody & Peatross, Shreveport, for plaintiff-respondent.
Robert T. Jorden, George H. Robinson, Jr., Liskow & Lewis, Lafayette, Lawrence E. Donohoe, Jr., Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, John M. McCollam, Gordon, Arata & McCollam, New Orleans, Robert Roberts, III, Blanchard, Walker, O'Quin & Roberts, Shreveport, D. R. Sartor, Jr., Snellings, Breard, Sartor, Shafto & Inabnett, Monroe, for amicus curiae.
*967 SUMMERS, Justice.
Franks Petroleum, Inc., applied to the Commissioner of Conservation on May 12, 1976 for a public hearing. The application set forth that Franks would propose to establish and maintain a unitized operation and secondary recovery project for the Cotton Valley reservoir of the Minden Field, Webster Parish, Louisiana, pursuant to Section 5 C of Title 30 of the Revised Statute.[1]
Attached to the application was a plat of the area proposed to be unitized, and a list of the 57 parties at interest and represented owners in the proposed unit area. Maurice L. Brown was not listed.
Upon receipt of the application the Commission notified Franks on June 2, 1976 that a hearing would be held in Baton Rouge on July 13, 1976. At the same time the Commission issued its legal notice to the interested parties and represented owners and on June 3, 1977 caused the notice to be published in the State-Times, a daily newspaper of general circulation, published in Baton Rouge.
*968 When Franks received this notice it applied to the Commission by letter for a continuance of the July 13, 1976 hearing until a later date.
In the interval between the application and the continuance Sharon DeFatta, the coordinator of operations of Maurice L. Brown's company in its Shreveport office, read in the Shreveport Times newspaper on May 25, 1976 that Franks Petroleum, Inc., and Alice-Sidney Oil Co. planned to engage in a secondary recovery unit in the Cotton Valley Formation in the Minden Field. She therefore contacted the Commissioner's District Office in Shreveport and verified the fact that an application had been made to the Commissioner, at which time she was furnished with a copy of the application. The Commissioner's representative in the Shreveport Office could not tell her at that time when the hearing would be held. On occasions thereafter her secretary called the Commissioner's office to obtain the date of the hearing. The record does not indicate how long this effort continued.
In the meantime attorneys for Franks and Maurice L. Brown had been discussing the secondary recovery project and the feasibility of purchasing Brown's override in the property involved in the proposed project. As a result, on June 8, 1976 Franks' attorney addressed a letter to the Kansas City office of Maurice L. Brown, to the attention of its General Counsel, in answer to their request for engineering data relating to the secondary recovery proposal. The letter stated that the engineering data had been furnished to the Shreveport office of Maurice L. Brown several months previously and copies could be obtained there. Frank's attorney also advised that Brown's request for a copy of the operating agreement covering the proposed unit would not be complied with, for overriding royalty interest owners had no interest in that agreement.
Brown's Shreveport attorney thereafter wrote to Franks' attorney on June 15, 1976 advising that they represented Brown in connection with the "Cotton Valley Secondary Recovery Unit, Minden Field, Webster Parish, Louisiana" and referred to Brown's claim of interest in these properties. "It is our understanding," the letter continued, "that a request has been made by Franks Petroleum, Inc., to the Louisiana Department of Conservation for a public hearing to unitize the above property for the purposes of secondary recovery." The letter asserted that Alice-Sidney Oil Company and others represented by the attorney to whom the letter was addressed were claiming interest adverse to the interest of Brown. And that Brown had not been compensated for its interest in the personal property on these leases. In closing, the letter read: "We believe these issues should be met with and resolved before any unitization proposal is made and acted upon." Copies of this letter were sent to counsel for Franks, to Franks' Shreveport office and to the Department of Conservation office in the same office building in which the writer's office was located.
Thereafter, counsel for Franks appeared formally before the Commissioner at the July 13, 1976 hearing and requested on the record that the hearing be continued, to be reset on the next calendar of hearings scheduled for Shreveport. The fact of this continuance is supported by the Commissioner's statement to that effect at the subsequent September 15, 1977 hearing in Shreveport, to which the matter had been continued. The record does not indicate that Brown was represented before the Commissioner on July 13, 1976.
At the hearing held by the Commissioner in Shreveport on September 15, 1977 Brown was represented by his attorney who took the position that the Commissioner was without authority to conduct the hearing because Brown had not received notice and had no opportunity to make a presentation. He then offered to introduce an unconformed copy of an assignment and sale, which he said he would conform later. Stating that the hearing had been continued from some time back, the Commissioner inquired why counsel was not prepared. In reply counsel asserted that he had just gotten into the case the day before because his *969 partner was in court and had been for two weeks.
At the September 15, 1977 hearing Franks established by expert testimony the feasibility of the proposed secondary recovery plan to the satisfaction of the Commissioner. On that occasion counsel for Franks also stated for the record that he had been advised by the attorney for Barnwell Production Company and Barnwell Drilling Co., Inc., that John R. Barnwell, who signed the assignment to Brown upon which Brown based its claim of interest, was without authority to do so and that the assignment was considered null and void. For that reason, he stated, Brown was not a record owner and was not given the usual notice, although Brown did have actual notice as his attorney's letter of June 15 indicated.
Franks also introduced a unit agreement and unit operating agreement executed by in excess of 95 percent of the royalty owners, in excess of 93 percent of the overriding royalty owners and 100 percent of the working interest owners, thus satisfying the requirement that 75% of the interested owners agree in writing to the pool-wide unit. The unit agreement designated Franks as the operator.
Based on this record the Commissioner issued his order 457-EE dated September 23, 1976, effective October 1, 1977 approving the unitization and the proposed secondary recovery plan. In a letter dated October 1, 1977 addressed to the Commissioner, counsel for Brown renewed its protest to the hearing because no notice had been furnished. The letter also advised the Commissioner that suit was being instituted that day to establish Brown's interest in the unit area, and requested that the order not be issued until that suit was resolved. A copy of the petition was enclosed.
When Brown's attorney received the Commissioner's order two days later, he applied for a rehearing, and by a second letter on October 8, 1976 furnished the Commissioner with a copy of an affidavit by Sharon DeFatta setting forth that she had reviewed Brown's records and that he held more than 25 percent of the total leasehold or working interest in the unit area involved at the hearing of September 15 and affected by the Commissioner's Order Number 457-EE.
Brown's application for a rehearing was rejected by the Commissioner on October 18, 1977 on the ground that the assignments and contracts of sale upon which Brown relied in its suit were not entered of record at the hearing, but the Commissioner assured him that if the suit decided that Franks had less than the requisite 75 percent ownership at the time the hearing was held the order would be stayed.
Brown's suit for a declaration of his rights under the purported assignments and sale was filed in Webster Parish against Alice-Sidney Oil Company and Franks Petroleum, Inc. At the same time he instituted suit in East Baton Rouge Parish against the Commissioner to enjoin the enforcement of Order Number 457-EE until a definitive determination of his rights under the assignments in the Webster Parish suit. Franks intervened in this suit in favor of the Commissioner's position resisting the injunction. Shortly thereafter Brown filed a supplemental and amending petition in the Webster Parish suit to enjoin Franks Petroleum, Inc., and Alice-Sidney Oil Co. from taking any action under or pursuant to the unit agreement or unit operating agreement until a final determination of the rights sought to be recognized in the Webster Parish suit. Exceptions of lack of jurisdiction and improper venue were filed by Franks and Alice-Sidney to the supplemental and amending petition for injunction. Holding that this petition for injunction was a collateral attack upon an order of the Commissioner for which the exclusive venue was in the Parish of East Baton Rouge, the trial judge sustained the exceptions to jurisdiction and venue. This ruling was affirmed on appeal. Brown v. Alice-Sidney Oil Co., La.App., 343 So.2d 745. Certiorari was denied in this Court. 344 So.2d 1056.
In the meantime, prior to the decision on the question of Brown's interest in the unit *970 area by the Webster Parish Court (the matter is apparently still pending), a hearing was held in East Baton Rouge Parish on the petition to enjoin the enforcement of the Commissioner's Order. That suit resulted in a judgment in favor of the Commissioner and Franks denying the injunction. On appeal to the First Circuit the judgment was reversed, that court holding that the Commissioner's Order number 457-EE was void. The decision was based upon a finding that the hearing was held without notice to Brown, and the Commissioner's order did not contain mandatory findings of jurisdictional facts upon which its issuance is conditioned. Brown v. Sutton, La.App., 349 So.2d 898. This Court granted certiorari. 350 So.2d 1217.
When the record was lodged in this Court Brown filed a motion to dismiss on December 5, 1977 alleging that the Commissioner's petition for rehearing in the Court of Appeal was not filed until fifteen days after receipt of the notice of judgment and, therefore, the judgment of the Court of Appeal became final and executory. The motion to dismiss is without merit. The Commissioner and Franks filed a joint petition for rehearing which was one day late as to the Commissioner, but timely as to Frank, they having received notice of judgment on different days.
In this posture of the case three issues are presented by the motion to dismiss and the application for certiorari and review: 1) The merits of the motion to dismiss; 2) whether the Commissioner's Order was issued without notice; and 3) whether Section 5(C) requires that the Commissioner's Order must contain mandatory findings of jurisdictional facts.

The motion to dismiss
Article 1091 of the Code of Civil Procedure provides that
"A third person having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties thereto by: . . . (2) Uniting with the defendant in resisting the plaintiff's demand . . . ."
It was pursuant to this Article that Franks sought and was allowed to intervene in these proceedings. Its intervention was without objection. Consequently Franks became a party to the litigation. As a party Franks was entitled to seek recourse by appeal to a superior tribunal for a review of its rulings and judgments. La. Code Civ.Pro. art. 2082. Even a party who could have intervened in the trial court may appeal, whether or not any other appeal has been taken. La.Code Civ.Pro. art. 2086.
An intervenor's right to seek review by certiorari of judgments of courts of appeal is likewise well-established. Section 4450 of Title 13 of the Revised Statutes gives "any party in interest who may feel aggrieved by the judgment of the intermediate appellate court" a right to apply to the Supreme Court for a writ of certiorari, or review, to determine or consider questions of law or jurisprudence. This right of the intervenor to seek review is not dependent upon whether other parties to the litigation also seek review. State ex rel. Guste v. Simoni, Heck & Associates, 331 So.2d 478 (La.1976). The intervenor Franks is properly before this Court. It is therefore in order for the Court to adjudicate Franks' rights under the contested order.

Notice
Section 5 C sets forth that the Commissioner can unitize, pool and consolidate "only after notice." Section 6 of Title 30 authorizes the Commissioner to prescribe rules of procedure. Rule 12 of the "Rules of Procedure for Conducting Hearings Before the Commissioner of Conservation," effective September 1, 1971, pertinently provides that "If the application relates to a poolwide unit, then a copy of the application shall be furnished each Interested Owner and Represented Party."
Advertisement in the State-Times newspaper alone was, therefore, inadequate to satisfy the requirement of notice in this case. However, while no copy of the application *971 was furnished to Brown initially, when Brown's Shreveport coordinator of operations learned on May 25, 1976 that a proposed hearing was in the offing by Alice-Sidney and Franks to form a pool-wide unit and institute a secondary recovery project, she promptly contacted the Commissioner's District Representative in Shreveport and obtained a copy of Franks' application. It may be inferred also that the records of the Commissioner's District Office in Shreveport contained all documents pertaining to the matter, including the Commissioner's notice that a hearing would be held on July 13 and Franks' request for a continuance. With this information, a public record, it was then a simple matter to keep informed of the hearing date, either by inspection of the record of the proceeding or by ascertaining the hearing date by a phone call either in the principal office of the Commission in Baton Rouge or the District Office in Shreveport.
Notwithstanding Brown's alleged failure to ascertain the hearing date, it is obvious from the correspondence between the attorneys of Brown and Franks that the date of the September hearing could have been, or more likely was, available to Brown's representatives in ample time before September 15 to prepare a presentation of Brown's position in the matter.
Counsel for Brown, as early as June 8 in the case of the letter to Brown's General Counsel in Kansas and as early as June 15 in the case of the letter from Brown's Shreveport attorney to Franks' attorney, were undoubtedly aware that a hearing was in the offing. They, too, being knowledgeable in these matters were able to keep informed of the location and time of the hearing by visiting the Commissioner's District Office in the same Shreveport office building in which the Shreveport attorney maintained his office. A telephone call would have produced the same information.
While the attorney who did appear at the September 15 hearing professed that he was not aware of the hearing date until a day or so prior to September 15, his statement does permit the inference that his associate had knowledge of the hearing date for some time, at least two weeks prior to September 15. Brown's counsel's sole complaint at the hearing pertained to lack of notice, no other opposition was asserted.
Because Brown was aware that a hearing on the unitization project was forthcoming, at least since June 15, 1976, there was ample time to make proper inquiries and prepare a presentation of Brown's position in the matter. The copy of the application received by Brown's representative on May 25, 1976 gave the information required to prepare such a presentation.
Thus the evidence is undisputed that Brown had actual knowledge of the proposed project and that a hearing was forthcoming. Inferences and circumstances from the recited facts also support a finding that Brown's representatives had knowledge sufficiently in advance of the specific place of the hearing and its date in Shreveport on September 15. These facts and circumstances also support a conclusion that no prejudice resulted to Brown by reason of the failure to initially receive a copy of the application and notice of the hearing from the Commissioner.
In the case where a hearing is continued, it is apparently, in some instances, the Commissioner's practice to consider the initial formal notice to be adequate. Those notified being expected to keep informed regarding the continuances and the date and place of the hearing to be held in lieu of the original fixing, either by attending the original hearing at which the announcement is made or by obtaining the information from the Commissioner's office in Baton Rouge or in the district where the property is located. While such a practice may prove inadequate in some instances, this record convincingly indicates that no hardship or injustice was incurred by Brown by reason thereof. He was well-represented by competent counsel knowledgeable in this field, and presumed to be familiar with the practices before the Commission. In this instance a lack of formal notice having been cured by actual notice, it became incumbent upon Brown to keep informed.
*972 As a general proposition, it is reasonable to expect one with knowledge of notice of an administrative proceeding affecting his rights not to stand by until the day of the hearing and then for the first time assert lack of notice. Elgin, J. & E. Ry. Co. v. Burley, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1945); Montana Power Co. v. Federal Power Comm., 87 U.S.App.D.C. 316, 185 F.2d 491 (1950), cert. denied, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951); 73 C.J.S. Public Administrative Bodies and Procedure § 131.
Cases have also held that appearance in person or by attorney at an administrative hearing waives any irregularity or imperfection in the service of notice. See State ex rel. Williams v. East Baton Rouge School Board, 36 So.2d 832 (La.App.1948); Kovack v. Licensing Board, City of Waterville, 157 Me. 411, 173 A.2d 554 (1961) and McLain v. Planning Commission of City of Chico, 156 Cal.App.2d 161, 319 P.2d 24 (1957).
These principles are applicable here. It is the opinion of the Court that the requirement of notice was met.

Findings of Jurisdictional Facts in the Commissioner's Order
With respect to the pool-wide unit involved here, Section 5 C provides:
"Any order for such a unit operation shall be issued only after notice and hearing and shall be based on findings that (1) the order is reasonably necessary for the prevention of waste and the drilling of unnecessary wells, and will appreciably increase the ultimate recovery of oil or gas from the affected pool or combination of two pools, (2) the proposed unit operation is economically feasible, (3) the order will provide for the allocation to each separate tract within the unit of a proportionate share of the unit production which shall insure the recovery by the owners of that tract of their just and equitable share of the recoverable oil or gas in the unitized pool or combination of two pools, and (4) at least three-fourths of the owners and three-fourths of the royalty owners, such three-fourths to be in interest as determined under (3) hereof, shall have approved the plan and terms of unit operation, such approval to be evidenced by a written contract or contracts covering the terms and operation of said unitization signed and executed by said three-fourths in interest of said owners and three-fourths in interest of the said royalty owners and filed with the Commissioner on or before the day set for said hearing."
These four requirements were referred to by the Court of Appeal as the "mandatory findings of jurisdictional facts upon which its [the Commissioner's orders] issuance is conditioned." Because the Court of Appeal found that the Commissioner's order did not contain these findings, it was held to be void and it was annulled.
The Commissioner's Order Number 457-EE recites: "following legal publication and posting of notice, and notice by mail to all known interested parties," it being "reasonably necessary to conserve the oil and gas resources of the State, to prevent waste . . ., to avoid the drilling of unnecessary wells and otherwise to carry out the provision of law . . . ." A finding that the secondary recovery would appreciably increase the ultimate recovery of oil from the affected pool is implicit in the testimony of the experts, who appeared on behalf of Franks at the hearing and by the exhibits filed. The petroleum engineer testified that as a result of the secondary recovery project "the increased profit to the working interest is estimated to be somewhat over $15.4 million. The increase in profit to the 1/8th royalty interest is estimated to be about $2.8 million."
In addition, the petroleum engineer testified: "The future profit by primary operations will be $228,500. The estimated future profit over and above the investment and operating expenses from secondary operations is estimated to be over $15 million. . . ."
Obviously, the project would "appreciably increase the ultimate recovery." The requirement under (1) of the above quoted provision of Section 5 C was therefore supported *973 by the record. It is hardly open to question that on this evidence the proposed unit operation is economically feasible as required by (2) above.
By an attachment to the order, including a plat and a schedule showing each tract's size and percentage of participation in the production to be realized from the unit, the requirement of (3) is satisfied. That part mandates that the order provide for the allocation to each tract within the unit of a proportionate share of the unit production, insuring to the owners their equitable share of the production.
A specific finding in the order fulfills the requirement of (4) pertaining to the 75 percent requirement, viz.:
"The Commissioner of Conservation finds as follows:
. . . . . .
"2. That the applicant has offered and introduced into evidence at the public hearing a Unit Agreement ratified and executed by the owners of more than seventy-five (75%) per cent of the total royalty interest and more than seventy-five (75%) per cent of the total leasehold or working interests in the field. That the applicant has also offered and introduced into evidence a Unit Operating Agreement which has been executed and ratified by the owners of more than seventy-five (75%) per cent of the total leasehold or working interests in the field."
Although counsel for Brown contends that he introduced an unconformed act of assignment at the September 15 hearing which evidenced the fact that Brown owned more than a 25 percent interest in the proposed unit, the Commissioner found the document was not in the record. At the time when counsel purported to introduce the assignment, however, he did not state the percentage of interest the assignment conferred on Brown. Considering this fact, the unauthenticated character of the assignment, and the statement of Franks' attorney in the presence of Brown's attorney that the assignment was not executed by one authorized to sign (a fact not disputed at the hearing), the finding of the Commissioner is neither arbitrary or capricious.
Although some of the evidence which supports all four of the mandatory conditions which must be satisfied for issuance of a valid order are not contained in the order itself, the conditions are in fact supported by the record. Due to the fact that none of these mandatory conditions were contested at the hearing, except notice, failure to include some of these findings in the order itself involves no prejudice to Brown, the only party complaining of the order's invalidity. And, as our determination on the notice issue resulted in a finding that there was no lack of notice, all of the mandatory conditions to the issuance of the order have been fulfilled. Principally, the findings are articulated in the order itself.
Order number 457-EE was therefore based upon the findings made mandatory by Section 5 C.
A contrary decision would sometimes follow in a situation where a finding was not contained in the order with respect to a mandatory condition which had been contested and where the Commissioner's expertise should have been employed in a finding to resolve the contradictions in the evidence.
Proper regard for the rightful concern of interested parties where valuable rights to oil and gas are involved makes desirable that the State's power be exercised only where the statutory authority affirmatively appears. The sacrifice of these legitimate interests may as readily result through the Commissioner's oversight or neglect as by improper findings. The insistence that the Commission make these jurisdictional findings before it undertakes to act not only gives added assurance that these valuable interests for which the legislature enacted these safeguards will be observed, but it also gives to the reviewing courts the assistance of an expert judgment on a knotty phase of a technical subject. City of Yonkers v. United States of America, 320 U.S. 685, 64 S.Ct. 327, 88 L.Ed. 400 (1943).
*974 Administrative proceedings involving a similar problem were the subject of a caveat to administrative bodies by this Court in the recent decision of Baton Rouge Water Works v. Louisiana Public Service Commission, 342 So.2d 609 (1977):
"For purposes of judicial review, and in order to assure that the Commission has acted in accordance with law, it is usually preferable that, in a contested case involving complex issues, the administrative agency makes findings as to the central disputed issues and explain the reasons for its determination. Cf.: Louisiana Power and Light Co. v. Louisiana Public Service Commission, 324 So.2d 430 (La.1975); White v. Louisiana Public Service Commission, 259 La. 363, 250 So.2d 368, 373 (1971); Hunter v. Hussey, 90 So.2d 429 (La.App. 1st Cir. 1956), certiorari granted. `It is enough if the Commission proffers findings and conclusions sufficiently detailed to permit reasoned evaluation of the purposes and implications of its order.' In re Permian Basin Area Rate Cases, 390 U.S. 747, 814, 88 S.Ct. 1344, 1384, 20 L.Ed.2d 312 (1968). See also 2 Davis, Administrative Law Treatise, Chapter 16 (1958); 2 Cooper, State Administrative Law 465-78 (1965); Schwartz, Administrative Law, Sections 140, 141 (1976).
"We have not before now, however, held that such formal findings and reasons are sacrosanct to the validity of an administrative determination, unless required by statute. Nevertheless, Louisiana courts have on occasion remanded for this purpose, when unable to review the agency determination in the absence thereof. See Louisiana decisions cited in the preceding paragraph."
For the reasons assigned, the judgment of the Court of Appeal is reversed and set aside, and Order number 457-EE of the Commissioner of Conservation is declared valid. Brown's attack upon the order is therefore dismissed at its cost.
NOTES
[1] La. R.S. 30:5(C):

"Without in any way modifying the authority granted to the commissioner of Subsection B of Section 9 of this Title to establish a drilling unit or units for a pool and in addition to the authority conferred in Subsection B of this Section, the commissioner of conservation, upon the application of any interested party, also is authorized and empowered to enter an order requiring the unit operation of any pool or a combination of two pools in the same field, productive of oil or gas, or both, in connection with the institution and operation of systems of pressure maintenance by the injection of gas, water or any other extraneous substance, or in connection with any program of secondary recovery; and the commissioner is further authorized and empowered to require the unit operation of a single pool in any situation where the ultimate recovery can be increased and waste and the drilling of unnecessary wells can be prevented by such a unit operation. In connection with such an order of unit operation, the commissioner shall have the right to unitize, pool and consolidate all separately owned tracts and other property ownerships. Any order for such a unit operation shall be issued only after notice and hearing and shall be based on findings that (1) the order is reasonably necessary for the prevention of waste and the drilling of unnecessary wells, and will appreciably increase the ultimate recovery of oil or gas from the affected pool or combination of two pools, (2) the proposed unit operation is economically feasible, (3) the order will provide for the allocation to each separate tract within the unit of a proportionate share of the unit production which shall insure the recovery by the owners of that tract of their just and equitable share of the recoverable oil or gas in the unitized pool or combination of two pools, and (4) at least three-fourths of the owners and three-fourths of the royalty owners, such three-fourths to be in interest as determined under (3) hereof, shall have approved the plan and terms of unit operation, such approval to be evidenced by a written contract or contracts covering the terms and operation of said unitization signed and executed by said three-fourths in interest of said owners and three-fourths in interest of the said royalty owners and filed with the commissioner on or before the day set for said hearing. The order requiring the unit operation shall designate a unit operator and shall also make provision for the proportionate allocation to the owners (lessees or owners of unleased interests) of the costs and expenses of the unit operation, which allocation shall be in the same proportion that the separately owned tracts share in unit production. The cost of capital investment in wells and physical equipment and intangible drilling costs, in the absence of voluntary agreement among the owners to the contrary, shall be shared in like proportion; provided that no such owner who has not consented to the unitization shall be required to contribute to the costs or expenses of the unit operation, or to the cost of capital investment in wells and physical equipment and intangible drilling costs, except out of the proceeds of production accruing to the interest of such owner out of production from such unit operation. However, no well costs credit allowable shall be adjusted on the basis of less than the average well costs within the unitized area. It is provided, however, that the order requiring unit operation shall not vary nor alter any of the terms of the above required written contract or contracts evidencing approval nor impose any terms or operations upon the non-signers of said contract or contracts more onerous than the terms and operations set out in said contract or contracts.
"No order of the commissioner entered pursuant hereto shall have the effect of enlarging, displacing, varying, altering or in anywise whatsoever modifying or changing contracts in existence on the effective date of this Act concerning the unitization of any pool (reservoir) or pools (reservoirs) or field (as defined in said contract) for the production of oil or gas, or both."