SAVOIE, Judge.
In these consolidated actions, the plaintiffs-appellants seek judicial review of Order 1047-B issued by the Office of Conservation of the State of Louisiana. Plaintiffs-appellants are Kaiser Aluminum Exploration Company; Park Lane Enterprises, Inc.; Expec Resources, Limited; David Ewell; Leighton Ewell; Rosa McMillan; Betty Craig; Dolese Concrete Company; Louisiana National Bank, as trustee for the Kirk E. Williams, Jr. Inter Vivos Trust and Bernadette S. Williams Inter Vivos Trust, and Chevron U.S.A., Inc.[1] Defendant-ap-pellee is Herbert W. Thompson, Commissioner of Conservation. Also appellees are intervenors on the side of the defendant, who are Celeron Oil & Gas Company; First Energy Corporation; Union Texas Petroleum; Terra Resources, Inc.; Borden, Inc.; and TXO Production Corporation.[2]
By Office of Conservation Order 1047, dated effective November 21, 1978, the Commissioner of Conservation defined the 17,600' Tuscaloosa Sand, Reservoir A, Irene Field, as that gas and condensate bearing sand between the intervals of 17,-575' — 19,112'. Order 1047 also created *242 twenty drilling and production units (A-T) for the sand. By Order 1047-A, dated effective September 18, 1979, the Commissioner created five additional drilling and production units (U-Y) for the sand. A subsequent Order, 1047-A-l, dated effective January 26, 1982, created one additional drilling and production unit (Z).
On May 17, 1985, Celeron Oil & Gas Company (Celeron) gave written notice that a pre-hearing conference would be held on June 6, 1985 to consider its proposed application to redefine the 17,600' Tuscaloosa Sand, Reservoir A, Irene Field, into two reservoirs; to dissolve the units previously created by Order 1047; and to create revised drilling and production units. Pursuant to Celeron’s application, a hearing was held on July 23-25,1985, and Order 1047-B was issued, dated effective July 23, 1985. Order 1047-B redefined the sand created by Order 1047 into two reservoirs — Reservoir A between the interval of 17,575-17,-730', and Reservoir B between the interval of 17,090-17,210'; dissolved the twenty units created by Order 1047; created on a non-geographic basis six units for the Upper Tuscaloosa Sand, Reservoir A, and a single drilling and production unit for the Upper Tuscaloosa Sand, Reservoir B.
From this order, plaintiffs sought injunc-tive relief and judicial review in district court. On June 6, 1986, the trial court upheld the validity of the Commissioner’s order and dismissed the plaintiffs’ action. Plaintiffs then filed this appeal. Subsequently, the Commissioner issued Order 1047-B-l, dated effective November 18, 1986.
Order 1047-B-l dissolved the five drilling and production units in the 17,600' Tuscaloosa Sand, Reservoir A, which had been created by Order 1047-A. However, Order 1047-B-l ordered no change in the drilling and production units in the Upper Tuscaloosa Sand, Reservoirs A and B, which had been created by Order 1047-B. Finally, Order 1047-B-2, dated effective December 11, 1986, dissolved the drilling and production units created for the Upper Tuscaloosa Sand, Reservoirs A and B, which had been created by Order 1047-B, and created a single reservoir-wide unit for the Upper Tuscaloosa Sand, Reservoir A. Orders 1047-B-l and 1047-B-2 are final, as the sixty day delay for seeking judicial review of 1047-B-l and 1047-B-2 expired without any party seeking review.
On the basis of these subsequent orders, defendant-appellees filed a motion to dismiss plaintiffs’ appeal on the grounds of mootness. This court denied the motion to dismiss the appeal. Kaiser Aluminum Exploration Company v. Thompson, 512 So.2d 1197, 1200 (La.App. 1st Cir.1987).
We note, however, that due to the subsequent orders, Order 1047-B only controlled the approximately sixteen month period from July 23, 1985 through November 18, 1986.
On appeal, plaintiffs-appellants urge the following assignments of error:
1. The district court erred in finding that adequate notice of the proposed hearing before the Commissioner of Conservation to revise units previously formed by the Commissioner for the Irene Field had been given.
2. The district court erred in failing to find that Order Number 1047-B was issued by the Commissioner of Conservation in violation of LSA-R.S. 30:6 and Rules 3 and 7 of the Commissioner of Conservation’s Rules of Procedure.
3. The district court erred in failing to find that Order Number 1047-B was issued by the Commissioner of Conservation in violation of LSA-R.S. 49:950 et seq.
4. The district court erred in failing to find that Order Number 1047-B was issued by the Commissioner of Conservation in violation of appellants’ due process rights under the United States and Louisiana Constitutions.
5. The district court erred in failing to find that the absence of a Statement of the Underlying Facts supporting Order Number 1047-B’s Findings invalidated it.
6. The district court erred in not finding that Order Number 1047-B is invalid because it violates the provisions of LSA-R.S. 30:3 in that in redefining the pool for the Irene Field it excludes known *243 productive strata and thereby encourages waste and the drilling of unnecessary wells.
7. The district court erred in finding that the fact that the effective date of Order Number 1047-B predated the adjournment of the hearing did not invalidate it.
Because we find assignments of error numbers 1 and 2 have merit, we pretermit discussion on assignments of error numbers 3 through 7.
Judicial review of an order of the Commissioner is governed by LSA-R.S. 30:12 B (5), which reads as follows:
The court may affirm the decision of the assistant secretary or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(a) In violation of constitutional or statutory provisions;
(b) In excess of the statutory authority of the agency;
(c) Made upon unlawful procedure;
(d) Affected by other error of law;
(e) Arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(f) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. In the application of the rule, where the assistant secretary has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the assistant secretary’s determination on credibility issues.
Plaintiffs-appellants contend in part that the Commissioner failed to follow the statutes and rules of procedure regarding notice. LSA-R.S. 30:6B provides as follows:
No rule, regulation, order, or change, renewal, or extension thereof, shall, in the absence of an emergency, be made by the commissioner under the provisions of this Chapter except after a public hearing upon at least ten days’ notice given in the manner and form prescribed by him. This hearing shall be held at a time and place and in the manner prescribed by the commissioner. The commissioner, in his discretion, may designate a member of his staff to conduct public hearings on his behalf. Any person having an interest in the subject matter of the hearing shall be entitled to be heard. Whenever any application shall be made to the commissioner of conservation for creation, revision, or modification of any unit or units for production of oil or gas, ... the applicant shall be required to file with the application two copies of a map of such unit or units or well spacing pattern or two explanations of such plan of cycling, pressure maintenance or restoration, or other secondary recovery program and at least thirty days’ notice shall be given of the hearings to be held thereon, in the manner prescribed by the commissioner of conservation and a copy of such plat or explanation of program shall remain on file in the office of conservation in Baton Rouge and in the office of the district manager of the conservation district in which the property is located, and be open for public inspection, at least thirty days prior to such hearing. (Emphasis ours).
The Commissioner has adopted Rules of Procedure for hearings to be held before him. Pertinent rules are as follows:
RULE 1 — DEFINITIONS
INTERESTED OWNER — shall mean any owner as owner is defined in Title 30 of Louisiana Revised Statutes of 1950, who is known to the applicant after reasonable search to presently own an interest within the area of, or proximate to, the tracts directly affected by the application. (Emphasis ours).[3]
*244 RULE 2 — APPLICABILITY
These Rules of Procedure shall be applicable to all hearing applications which require thirty (30) days notice as set forth in Section 6B of Chapter 1 of Title 30 of the Louisiana Revised Statutes of 1950....
RULE 3 — PRE-APPLICATION NOTICE
Except as provided by Rule 8, any person intending to apply for a hearing, prior to filing application, shall send a notice outlining the proposal to the Commissioner ... with a copy ... to each Interested Owner and Represented Party....
Each pre-application notice shall include or be accompanied by the following:
a. A list of the names and addresses of all Interested Owners and Represented Parties to whom it is being sent.
b. A statement that a reasonable effort has been made to determine to whom the notices as required by this rule must be sent.
[[Image here]]
RULE 7 — HEARING APPLICATION
The hearing application may be filed immediately after the pre-application conference or as otherwise provided in Rules 3 and 5 and shall be filed with the Commissioner (in duplicate) with a copy to the District Manager and to each Interested Owner and Represented Party.... In addition to outlining the purpose thereof, the application shall include or be accompanied by the following:
a. A list of the names and addresses of Interested Owners and Represented Parties notified, as required by Rule 3(a).
b. A list of the names and addresses of all Interested Parties who are known to the applicant after reasonable search. In addition to the publication of the Legal Notice by the Commissioner in the official state journal, the applicant shall provide for posting of a copy of the Legal Notice of the hearing and unit plat or plats in a prominent place in the area affected and publication of a copy of the Legal Notice in a newspaper published in the vicinity or general area of the affected field at least fifteen (15) days before the hearing. The applicant shall mail copies of the Legal Notice to all Interested Owners, Represented Parties and Interested Parties and a copy of the unit plat or plats shall be included with the Legal Notice, if said parties have not already been furnished same. Evidence to establish posting, publishing and mailing shall be submitted at the hearing.
c.A statement that a reasonable effort has been made to obtain a complete list of Interested Parties, Interested Owners and Represented Parties. (Emphasis ours).
These Rules apply to the plaintiffs-appellants because they are “interested owners” as defined by Rule 1 of the Commissioner’s rules.
The trial court found that the plaintiffs-appellants had received proper notice:
[T]his court feels that neither Louisiana nor Federal laws were violated in this case because all of the plaintiffs, except four, received proper notice and attended or participated at the hearing. Three of the unnoticed plaintiffs obviously had actual notice because of letters to the Commissioner, which listed these parties as not having received notice. R.S. 30:6 requires 30 days notice in the manner prescribed by the Commissioner and legal notice was published in the official state journal more than 30 days prior to the hearings. The Commissioner’s rules of procedure require notice only after a reasonable search to obtain the names of those entitled to notice. Due process only requires the giving of notice beyond reasonable circumstances. Under the circumstances in this case, over 1,800 interested parties received notice. Notice was posted at the Baker City Hall. Celeron requested a list of lessees from *245 the Martin Exploration Company, who is a lessor in this area, and many other things throughout the record showing that there are evidencing reasonably [sic] efforts were made for proper notice.
Those plaintiffs alleged to have received no notice of the hearing are: Leighton Ewell, Rosa McMillan, Betty Craig, and Dolese Concrete Company. All four of these parties are land owners in Units S and T. At the preliminary injunction hearing in the district court, Mrs. Craig testified that she received no notice of the pre-hearing application conference called by Celeron, or of the July 23 hearing; she also stated that she did not attend the hearing. Mrs. Craig testified that she first received notice that there had been a hearing on October 20, when she was informed of the matter through a neighbor. It was stipulated that the direct testimony of Mrs. McMillan and Mr. Ewell would be the same as that of Mrs. Craig.
The trial judge determined that these three plaintiffs had actual notice based on a letter written by legal counsel for Kaiser on July 17, 1985, and sent to the Commission which reads in pertinent part:
Rule 3 requires applicant to send a pre-application notice to each Interested Owner and Represented Party. A reasonable effort must be made to determine the names and addresses of said people.
It has come to our attention that certain Interested Owners and Represented Parties were not put on Applicant’s list and did not receive the pre-application notice. These neglected people include:
Mary Mercedes Ewell Pugh, Dave Haas Ewell, Jr., Leighton Banks Ewell, Edmond Quik Ewell, Rosa Dennis Ewell McMillan, Elizabeth Ann Ewell Craig, Lola Dee Ewell McElyea, Martha Louise Ewell Greer, and other members of the Ewell family. All included within SU S and SU T of the Irene Field.
Rule 7 requires applicant to prepare an additional list of all Interested Parties after reasonable search, and to mail to all people on both lists a copy of the Legal Notice and the plat, if not previously furnished.
The Interested Owners and Represented Parties previously neglected still are not on applicant’s list, and did not receive the Legal Notice and plat.
The letter went on to request that based on the lack of notice, the July 23 hearing be canceled and a new hearing date be set after proper notice. From the letter, the trial court apparently concluded that the individuals listed must have been contacted in order to determine whether they had in fact received notice and that as a result of having been contacted, these individuals received actual notice.
However, there is testimony in the record which directly contradicts the trial court’s conclusion. Defendant-appel-lees introduced excerpts of the deposition of Ken Miller, a representative of Kaiser Aluminum. Mr. Miller testified that he had supplied Kaiser’s attorney with the names which appeared in Kaiser’s letter of July 17, 1985 to the Commissioner, which dealt with those interested owners who had not been noticed. Mr. Miller gave the names to Kaiser’s counsel because he “had dealt with the Ewells [all those parties named in the letter are members of the Ewell family] previously in the area and I noticed their name was not on the applicants [sic] list of notice parties.” Mr. Miller further testified that he did contact Edmond Ewell in July of 1985, the member of the Ewell family who lives on the property, and asked him if he was aware of the July 23 hearing; Mr. Ewell told Mr. Miller that he was not aware of the hearing. Mr. Miller’s testimony clearly shows that while he did contact Edmond Ewell in order to determine whether he had received notice of the July 23 hearing, Mr. Miller did not contact Mr. Leighton Ewell, Mrs. McMillan or Mrs. Craig.[4] Thus, these three plaintiffs did not *246 receive actual notice of the hearing through being contacted in order to determine if they had received notice of the hearing. We find that the trial court was clearly wrong in concluding that the letter shows that three of the plaintiffs received actual notice of the hearing. Our examination of the record shows that when Kaiser received Celeron’s application for a hearing, it concluded that based on the Commissioner’s Rules of Procedure, those parties listed by Celeron received notice and that those parties not listed were not notified. One of those parties not noticed was contacted by a Kaiser representative, and he verified that he had not received notice. The remaining members of the Ewell family were never contacted by the Kaiser representative.
A representative of the Dolese Concrete Company, the fourth unnoticed plaintiff, also testified. James Hayward testified that Dolese received no notice of the pre-application conference on June 6, or of the hearing on July 23. He further testified that no one from Dolese attended the hearing. Mr. Hayward testified that he was not informed of the hearing until November 1985.
The Commissioner’s Rules of Procedure require an applicant, such as Celeron, to attach statements to the pre-application notice and the hearing application notice that a reasonable effort has been made to determine to whom the required notices must be sent. Celeron attached these statements to its notices. The testimony introduced at the preliminary injunction hearing shows that George Harris, a landman for Celeron, was the person to whom the responsibility of ascertaining those parties to be noticed was delegated. The deposition of Mr. Harris was introduced at the preliminary injunction hearing. Mr. Harris was first questioned about the land map of Irene Field which Celeron possessed. According to Mr. Harris, the map encompasses twelve square miles, or the twelve units which Celeron originally sponsored, and one additional unit to the west. Celeron used the map to compile a list of names and addresses of lessors and owners of the land within this twelve square mile area. Mr. Harris was then questioned about the July 23, 1985 hearing. Mr. Harris was told by Mr. Todd, his boss, to compile a list for Celer-on’s attorneys to use in making an application to the Commissioner for a hearing. Mr. Harris testified:
I asked him [Mr. Todd] if we [Celeron] had to notify all those people that were in the units that were dry and the units that had produced a while and quit that I knew weren’t in the geological area, as such, and he suggested I call Mr. Dono-hoe [counsel for Celeron]. And I called Mr. Donohoe, and he said, ‘Get everybody.’ So, I used, basically, the list that had been built from the beginning, you know, everyone. There’s 1886 people on that list.
Mr. Harris’ testimony continued as followed:
QUESTION [by Mr. Redfearn, counsel for Kaiser Aluminum] Mr. Donohoe told you to get everybody that is involved in the matter referred to in the letter of May 17, 1985; is that right?
ANSWER That’s not the way it was said. He said — I said, ‘I’m supposed to get a list for this hearing.’ And he — I said, ‘Do we get only those people who are involved in the producing units or do we get the ones that are no longer productive or were dry?’ And he said, ‘Get everybody.’
QUESTION And in getting everybody, what did you do after you had gotten your instructions from Mr. Donohoe?
*247 ANSWER I used the list that had been compiled and brought up to date through the years.
QUESTION So it was simply a matter of your going to the list which had been compiled through the years; is that correct?
ANSWER Yes sir.
After further statements that he used the lists and maps which Celeron had possessed as to its 12 units, Mr. Harris testified as follows:
QUESTION [By Mr. Redfearn, counsel for Kaiser Aluminum] Did you make any attempt, whatsoever, to find out the ownership of minerals and leases in what are designated as Sand Unit R, S, T?
ANSWER No, sir. The only attempt we made as to any acreage within those units would be where leases from Martin or someone else crossed the line.
QUESTION So the—
ANSWER Our leases, for instance, we may have had some that went into those areas. Those are the only people that are on that list.
QUESTION So, you made no attempt at all, other than what you have just discussed, to find out the ownership in R, S, T, Q, P?
ANSWER Yes. We didn’t buy abstracts and examine titles to competitor leases within these areas, much less out here where we had no interest.
QUESTION Why did you not make any attempt to ascertain who these people were for purposes of your list attached to the letter of May 17, 1985?
ANSWER They had never been in any of these lists from the time of the beginning that I knew of, and I didn’t think it was necessary.
[[Image here]]
QUESTION [By Mr. Redfearn] So, since you were not instructed to find out the ownership of those various units early on, you made no attempt to — other than talk to Martin Exploration Company — to find out the owners, the interested owners, the interested parties, and the represented owners in those units?
ANSWER I did not.
QUESTION Were you aware of the fact that Celeron was requesting that these units, R, S, T, Q, P, B, — be dissolved?
ANSWER I must have read that in — I mean, I must have read that they were going to dissolve the units, but it didn’t really dawn on me that they were dissolving all of them until I got to the hearing.
[[Image here]]
QUESTION [By Mr. Redfearn] Mr. Harris, am I correct that the reason that you called Bob Martin of Martin Exploration Company to ascertain names and addresses of mineral owners, et cetera, was solely to find out the names and addresses of those parties who fell within the 12 units originally sponsored by Celeron in 1978?
MR. ABELL: [counsel for Celeron] Before you answer I want to ask are you talking about what the intent of Mr. Harris was or what he said to Mr. Martin?
MR. REDFEARN: I am asking what was his intent was and what was he trying to do.
MR. ABELL: There could be a difference between what he said to Mr. Martin and what he had in his mind.
MR. REDFEARN: (CONTINUING)
QUESTION Let us start with your intent.
ANSWER I was trying to get a list from him to see if I had all of the people on my list that he had as royalty owners. And it — so as I recall, I did have
QUESTION But when you say that, you were not trying to ascertain his royalty owners in units R, S, T, Q, P, were you?
ANSWER I wouldn’t say that I was, because I didn’t think people that were down there were interested in this.
QUESTION Am I correct in my understanding that you made no attempt to find out any of the owners, interested parties, mineral owners, royalty owners, overriding—
*248 ANSWER I didn’t buy abstracts, I didn’t send brokers to the courthouse to check — or to the tax records to check those no man’s land leases.
QUESTION And those fall, am I correct, in units Q, P, R, S, T?
ANSWER Yes. And out there on the east side, too.
QUESTION And, also, units M, N, 0?
ANSWER Yes. There are some people who were noticed in those units, but only those that we knew about. And because, like, Mr. Todd says; there are numerous subdivisions in there and also down in here that it would probably be impossible in record checking to determine all of the people in those units.
QUESTION Is it difficult to find a 27 acre tract in a 640 acre unit?
ANSWER For an experienced man, I don’t think it was if he was looking for it.
QUESTION What about a hundred acre tract?
ANSWER I think I could find one.
A review of the testimony of Mr. Harris, the party responsible for compiling a list of those to be notified for the July 23 hearing, shows that Celeron made no attempt to notify those parties with mineral interests in Units M-T, except where leasehold interests in Units M-T crossed over into Units A-L. This conclusion is further supported by Celeron’s attorney’s statements to the Commissioner at the July 23 hearing. The Commissioner, prior to the hearing on the merits, took up the issue of whether proper notice had been given. Celeron’s attorney stated that Celeron had made a reasonable effort “to notify everyone, not only in the units affected, but in the band around those units.” The attorney further stated that notice to those who were not in the affected units (A-J being the affected units) was not necessary because “we’re [Celeron] not asking for those undrilled units, for those units other than A through J to be revised.” Yet, as was pointed out by the Commissioner’s attorney, Celeron was asking to have all twenty drilling and production units dissolved, not simply Units A through J.
Thus, the only notice which was given as to those parties in units M through T was the publication of the notice in the State-Times, the official state legal journal, on June 15, 1985 and July 2, 1985, and the posting of the notice in the Baker City Hall and the East Baton Rouge Parish Courthouse.
The Commissioner found that a reasonable effort was made to notice all the people required to receive notice, based on the fact that notice had been published and posted, and that friends and neighbors of those not noticed had been noticed.
According to our jurisprudence, publication in a newspaper is not sufficient to meet the statutes and procedural rules of the Commissioner’s office. Brown v. Sutton, 356 So.2d 965 (La.1978). In Brown, an overriding royalty interest owner was not given individual notice by the Commissioner of a hearing to establish a unitization proposed secondary recovery plan; notice of the hearing was published in the State-Times, through which the owner learned of the hearing. The Louisiana Supreme Court, in ruling on whether the owner had proper notice of the hearing, reasoned:
Section 5 C [LSA-R.S. 30:5C] sets forth that the Commissioner can unitize, pool and consolidate ‘only after notice.’ Section 6 of Title 30 authorizes the Commissioner to prescribe rules of procedure. Rule 12 of the ‘Rules of Procedure for Conducting Hearings Before the Commissioner of Conservation,’ effective September 1, 1971, pertinently provides that ‘If the application relates to a poolwide unit, then a copy of the application shall be furnished each Interested Owner and Represented Party.’ Brown, 356 So.2d at 970.
Finding that the lack of formal notice was cured by actual notice and that no prejudice resulted to the owner because he was able to attend the hearing, the court dismissed the owner’s contentions as to notice.
In the case sub judice, the record establishes that the four unnoticed plaintiffs had *249 no actual notice. In those cases where statutory requirements for notice were not met and notice by publication was held to be sufficient, those parties to whom notice should have been given received actual notice in some manner. See Mayor & Council of Morgan City v. Ascension Parish Police Jury, 468 So.2d 1291 (La.App. 1st Cir.1985). Summerville v. Louisiana Department of Public Safety, 497 So.2d 344 (La.App. 2d Cir.1986).
According to LSA-R.S. 30:6B, thirty days notice must be given for a hearing to revise units. The notice must be given in the manner prescribed by the Commissioner. The Rules of Procedure, which apply to hearings requiring thirty days notice (Rule 2), require that interested owners and represented parties be sent a pre-application notice, a hearing application notice, and the legal notice of the hearings; additionally, the legal notice is to be posted and published. Furthermore, attached to the hearing application notice [to the Commissioner] must be a “list of the names and addresses of all Interested Parties who are known to the applicant after reasonable search.” (Rule 7). And, as earlier stated, the applicant in its pre-application notice is to submit a statement that a reasonable effort was made to determine to whom the notices as required by the rules must be sent.
In the case subjudice, Celeron, the applicant did not conduct a reasonable search or make a reasonable effort as to those parties in Units M-T. Examination of the record shows that Celeron put forth no effort to ascertain the parties involved in Units M-T. The hearing requested by Cel-eron affected those holding mineral interests in twenty units; a reasonable effort and search were made to notify those holding mineral interests in twelve of the twenty units. However, where no effort was made to notify those in the remaining eight units, we can not say that as to all those holding mineral interests in Units A-T, a reasonable effort was made. Apparently in an attempt to justify their total lack of effort, defendant-appellees contend that a full title search would have been required to notify those parties holding mineral interests in Units M-T. We disagree. These eight units were added to Order 1047 in 1978 through a counterplan submitted by Martin Exploration Company. Yet, Celer-on made no inquiry of Martin as to any of Martin’s leasehold interests in Units M-T except where Martin’s leases crossed over into Units A-L. Thus, we find that Celer-on, the applicant, failed to comply with the Commissioner’s procedural rules requiring notice. Moreover, the Commissioner was aware that no effort had been made to notify those holding mineral interests in Units M-T.
Celeron contends that non-compliance with Rule 3 and Rule 7 can not be used to invalidate Order 1047-B due to Rule 17. Rule 17 reads as follows:
Failure to comply with the provisions of or the spirit of these Rules of Procedure shall prevent an application from being advertised or heard, or shall prevent an opponent or supporting party from presenting evidence at the hearing, but an order issued by the Commissioner shall not be invalid by operation of this rule.
We disagree with defendant-appellee’s contention. Rule 17 cannot be used to disregard the legislative mandate set forth in LSA-R.S. 30:6 requiring the Commissioner to prescribe rules for the giving of thirty days notice prior to hearings. See State v. Union Tank Car Co., 439 So.2d 377 (La.1983). Furthermore, “administrative agencies are bound by their own rules which are promulgated to affect the rights and liabilities of members of the public.” Central Louisiana Electric Company, Inc. v. Louisiana Public Service Commission, 377 So.2d 1188, 1195 (La.1979). In this case, where the Commissioner’s own procedural rules for giving notice of hearings were violated, where those procedural rules were enacted pursuant to legislative mandate, and where the violation of those rules caused a large class of people to be without notice of a hearing before the Commissioner, we are not bound by Rule 17 to uphold the order.
Defendant-appellees further contend in brief:
*250 The longstanding practice of the Commissioner of Conservation has been to satisfy the thirty (30) day notice requirement of Section 6(B) by publishing the Legal Notice of the hearing in the official state journal more than thirty (30) days prior to the hearing date. The Rules of Procedure established by the Commissioner are not the manner which he prescribes for compliance with the thirty (30) day notice requirement of Section 6(B) of Title 30. The Rules of Procedure were designed to exceed this statutory notice requirement.
As was pointed out earlier, the Louisiana Supreme Court in the Brown case found that publication was insufficient to meet the requirements of LSA-R.S. 30:6 where the Commissioner’s rules required that a copy of the application be sent to the interested owner. Likewise, in this case we find that the statutory requirements of LSA-R.S. 30:6B are complied with only when the thirty day notice requirement is complied with in accordance with the Commissioner’s prescribed rules, which go beyond a requirement of publication and posting.
Because, the unnoticed plaintiffs-appellants have shown that the Commissioner’s order was made upon unlawful procedure, we must now determine from a review of the record whether substantial rights of the plaintiffs-appellants were prejudiced. LSA-R.S. 30:12 B(5). Defendant-appellees contend that plaintiffs-appellants’ rights were not prejudiced because Units S and T, in which plaintiffs-appellants held mineral interests, were not productive during the existence of Order 1047, and they were not to be included in Order 1047-B. Plaintiffs-appellants contend that substantial rights were prejudiced because they had no notice and consequently no opportunity to participate in any fashion at the hearing. We agree with plaintiffs-appellants’ contention. The purpose of the hearing was to dissolve the original units encompassing plaintiffs’ property. By defendant-appellees’ failure to attempt to inform the unnoticed plaintiffs of the July 23 hearing, the unnoticed plaintiffs were unaware of the proposed administrative action affecting their property, their right to attend the administrative hearing and present evidence, their right to be represented by legal counsel, and their right to confront and cross-examine adverse witnesses. See Durousseau v. Louisiana State Racing Comm., 399 So.2d 1288 (La.App. 4th Cir.1981). If the unnoticed plaintiffs had been noticed, they might have presented evidence which would have altered the Commissioner’s findings, thus placing their land within geological units or maintaining their lands within the geographical units. Although defendant-appellees contend that the unnoticed plaintiffs’ land was unproductive, at least one of the counterplans presented to the Commissioner at the hearing included the land of one of the unnoticed plaintiffs, Dolese Concrete Company.
Defendant-appellees further contend that the unnoticed plaintiffs failed to show that substantial rights were prejudiced because there was no proof that they would have attended and participated in the hearing. Defendant-appellees cite Placid v. North Central Texas Oil Co., 206 La. 693, 19 So.2d 616 (1944) for the proposition that plaintiffs-appellants must also show that they would have opposed the Commissioner’s proposed order successfully. However, in Placid, the royalty owner attacking the unitization order of the Commissioner based on his failure to receive proper notice was unsuccessful because the uni-tization order was advantageous to the royalty owner. The court stated; “The presumption is that Parten [royalty owner] would not have opposed the application [for unitization] — not only because an opposition to it would have been against his interest but also because it would have been without avail.” Placid Oil Co., 19 So.2d at 622. This presumption is not available to us in this case. Celeron’s proposal was disadvantageous to the unnoticed plaintiffs, giving rise to the possibility that they could have opposed Celeron’s proposition successfully. For these reasons, we find that the decision of the Commissioner as to Order 1047-B must be reversed where substantial rights of the plaintiffs-appellants *251 were prejudiced because the Order was issued in violation of statutory provisions and/or made upon unlawful procedure. LSA-R.S. 30:12B(5)(a) and (c).
Defendant-appellees repeatedly set forth in brief the difficulty and impossibility of notifying those interested parties in Units M-T. Yet, as we have tried to clarify in this opinion, the issue is not defendant-ap-pellees’ failure to notify the unnoticed plaintiffs of the hearing; the issue is the defendant-appellees’ failure to make a reasonable effort to notify those unnoticed plaintiffs. Making a reasonable effort to notify those interested parties in Units A-L where Units A-T are involved does not constitute a reasonable effort to notify all those in Units A-T.
For these reasons, the decision of the trial court upholding the Order is reversed, and we declare Order 1047-B invalid. Costs to be assessed against defendant-ap-pellees.
REVERSED.

. Originally, Acme Brick Company, Tolmak, Inc., and Kansas City Southern Railway Company were also plaintiffs. They have not joined in the appeal of the trial court decision.

. Rolfe McCollister, Sr. and F.N. Samuel originally intervened on the side of the Commissioner, but did not appeal the trial court decision.

. LSA-R.S. 30:3(8) defines "owner” as:
[T]he person who has the right to drill into and to produce from a pool and to appropri *244 ate the production either for himself or for others.

. Defendant-appellees contend that actual notice to Edmond Ewell constitutes actual notice to the unnoticed plaintiffs, citing the case of Poirier v. Burton-Swartz Cypress Co., 127 La. 936, 54 So. 292 (1911). However, the Poirier case is distinguishable from the case before us. In Poirier, where the actual knowledge of one co-owner was imputed to the remaining three co- *246 owners, the co-owner with actual knowledge was the representative of the other co-owners because they had delegated to him the responsibility of looking after the property. In the case before us, while Edmond Ewell did lease a portion of the land to live on, he did not manage the property or act as agent for each of his co-owners; each co-owner administered his interest individually.